## STETTAUER BROS. v. CARNEY & STEVENS.

1. PARTICULAR PARTNERSHIP; *Joint Interest in Business Venture; Communion of Profit and Loss.* In 1865, plaintiffs and defendants were each creditors of Wm. H. Baird, a merchant of Salt Lake City. In September of that year, Stevens, one of the defendants, went to Salt Lake, for the purpose of collecting these claims. To facilitate this collection, plaintiffs gave him an assignment of, and also a power of attorney, to receive or settle and adjust their claim. In February 1866, Stevens made an arrangement with Baird, by which the latter agreed to purchase and deliver flour at Salt Lake, in settlement of defendant's claim, at a

stipulated price, and also made a contract with P. & S. to ship the flour to Montana, for sale there. Though plaintiffs' names were not mentioned in either of these arrangements, Stevens intended that they should share in both, and made the arrangements for the benefit of both plaintiffs and defendants, and on his return informed plaintiffs of what he had done, and his acts were by them ratified and confirmed, and it was agreed that whatever moneys should be received by defendants applicable to the payment of their claim, should be divided *pro rata* between plaintiffs and defendants. Baird failed to perform his agreement, or to deliver any flour; but subsequently, and during the spring and summer of 1866, defendants, by means of an assignment, which was for the benefit of plaintiffs as well as of defendants, and at some expense, obtained possession of the goods of Baird, converted them into flour, salt, and barley, and shipped the same to Montana under the contract above referred to. The various steps in the transaction were from time to time, as they took place, made known to plaintiffs, who made no objections thereto, but acquiesced therein. All parties were acting in good faith. Owing to a decline in prices at Montana, the venture proved a failure, and loss resulted. *Held,* That plaintiffs were jointly interested in the venture, and liable to the defendants for their *pro rata* share of the loss.

2. INTEREST—*When Not Recoverable.* Whether there has been an unreasonable and vexatious delay in payment, is primarily a question of fact; and where, in a case tried before a referee, there is no finding of such delay, and upon the facts found the liability even is doubtful, the referee and district court deciding against the liability, this court, although it decides in favor of the liability, will not award interest.

3. PRACTICE; PETITION-IN-ERROR; *When Cross-Petition Will be Allowed.* Where the record below contains simply the pleadings, findings, and judgment, and the only questions which can be raised are as to the proper judgment to be entered upon such pleadings and findings, and each party claims that the district court erred in its judgment, *held,* that to the record as presented by the plaintiffs in error, the defendants in error might attach a cross-petition in error, and obtain a correction of the judgment in their favor. Overruling in this respect, *Bedell v. National Bank,* 16 Kas. 130, 133.

### Error from Leavenworth District Court.

STETTAUER BROS. brought their action against *Carney & Stevens,* claiming $8,893.23, and interest. Mathew Ryan, and Wm. H. Baird, were joined as co-defendants, but as the case comes here the questions in controversy in nowise affect them. *Carney & Stevens* answered, setting up several defenses, set-offs, and counterclaims, and demanded judgment

in their favor against *Stettauer Bros.* for $6,000, and interest. The action was commenced in January 1870. In May 1871, the case was referred to T. A. Hurd, sole referee, "to hear, determine, and report upon all the issues of fact arising in the case." The hearing was continued by consent, and order of the court, from time to time, and on the 17th of November 1873, the referee made and filed his final report. The referee found in favor of *Stettauer Bros.*, plaintiffs, that they were entitled to recover from *Carney & Stevens,* defendants, the sum of $4,446.63. Exceptions to the report were filed by both parties. A motion made by plaintiffs to set said report aside, was overruled. Plaintiffs thereupon moved for judgment in their favor, for the sum reported by the referee, and the defendants moved for judgment in their favor upon the findings of fact reported by the referee. These motions were heard at the February Term 1874. The journal-entry, omitting the title, is as follows:

"Now on this day come the plaintiffs herein, by Green & Foster, and Thomas P. Fenlon, their attorneys, and also come the defendants Thomas Carney and Thomas C. Stevens, by E. Stillings their attorney; and the court having had under advisement the motion of the said plaintiffs heretofore filed and argued herein, that judgment be rendered in their favor and against the said defendants Carney & Stevens, on the report of the referee herein, and having duly considered the same, and being well advised in the premises, now overrules said motion.

"And the court having also had under advisement the motion of the said defendants Carney & Stevens, heretofore filed and argued herein for judgment in their favor upon said report of the referee herein, and having duly considered the same, and being well advised in the premises, now overrules said motion, except as to the matter of the costs. * * *

"And the court, on consideration of the said report of the said referee herein, now finds, and orders and adjudges, that the said plaintiffs take nothing by their petition herein, and that the said defendants, Thomas Carney, Thomas C. Stevens, William H. Baird, and Mathew Ryan, are entitled to go hence without day, and to have and recover of and from the said plaintiffs their costs in this action expended."

To such decisions and judgment, the plaintiffs, and defendants *Carney & Stevens,* both excepted. · *Stettauer Bros.,* plaintiffs, filed their petition in error in this court, making *Carney & Stevens* defendants in error; and thereupon *C. & S.* filed their cross-petition in error.

*T. P. Fenlon, H. T. Green,* and *Clough & Wheat,* for Stettauer Bros.

*E. Stillings,* for Carney & Stevens.

The opinion of the court was delivered by

BREWER, J.: This was an action in the district court of Leavenworth county in which a judgment for costs was rendered in favor of the defendants. The case was tried before a referee, who reported his findings of fact, and conclusions. The testimony was not preserved, at least none that calls for any notice by us, for, while after the judgment there appears in the case-made what are said to be certain extracts from the testimony, yet counsel on both sides ignore this, and treat the case as standing before us upon the pleadings, the report, and the judgment. There are one or two questions of practice presented and discussed by counsel, but we shall first address ourselves to the principal question, and that is, the rights of the respective parties upon the facts as reported by the referee. In the opening of their brief, the learned counsel for plaintiff in error make this statement of their view of the questions involved:

"The general claim in the petition is, that the plaintiffs, with others, and the defendants Carney & Stevens, were creditors of Baird & Rively, and that Baird & Rively assigned their property to Carney & Stevens for the benefit of all their creditors; that Carney & Stevens accepted of such trust, and took possession of the property and wasted the same; that there was sufficient property, if properly handled, to pay plaintiffs' claim, but that none of it was paid, and the property converted by the defendants to their own use.

"The only issues to which we particularly desire to call the attention of the court are those made by Carney & Stevens, they admitting generally that they were trustees of the prop-

erty, alleging that while the property was in their care they disposed of the same to the best advantage, in a manner approved and advised by the plaintiffs; that there was a large loss in said disposition of the property, and that therefore, the plaintiffs, instead of obtaining a judgment against defendants, should share part of the loss thus incurred in the administration of the trust; and this is substantially the question between these parties."

In order to a clear understanding of the case, it will be necessary to notice the findings of fact as made by the referee. The first six findings show, in brief, an indebtedness on the part of W. H. Baird, as the successor of Baird & Rively, of Salt Lake City, to plaintiffs and to defendants. The further findings are as follows:

7th.—In the month of September 1865, the defendant Thomas C. Stevens left Leavenworth city for Salt Lake City, for the purpose, among other things, of collecting said claim of Carney & Stevens against Baird & Rively. Before leaving Leavenworth city, he, at the request of the plaintiffs, undertook to collect their said claim against Baird & Rively, and for the purpose of facilitating such collections, the plaintiffs executed and delivered to said Stevens a written assignment of their said claim against Baird & Rively. A copy of such assignment is exhibit "A" of defendant Carney's answer herein; and for a like purpose the plaintiffs executed and delivered to Stevens the power of attorney, a copy of which is exhibit "B" of defendant Carney's answer. Neither the plaintiffs, nor Stevens, intended that such assignment should vest in Stevens the title to said claim of the plaintiffs, nor authorize him to receive the same, only as the attorney and agent of plaintiffs.

8th.—In the month of February 1866, Stevens was in Salt Lake City, and called upon Baird for payment of the claim of Carney & Stevens against Baird & Rively, but received no payment thereon. Soon afterward Stevens, in the name of Carney & Stevens, entered into a verbal agreement with Baird, by which Baird agreed to procure, sell and deliver to Carney & Stevens, at Salt Lake City, or on the road leading therefrom to Helena, Montana Territory, to be transported to Helena for sale, flour at $7 per sack, the purchase-price for which it was agreed should be applied toward the payment of said claim of Carney & Stevens against Baird & Rively. At the time of making such agreement, Baird had

little if any of the flour intended to be delivered under it, but immediately commenced the purchase of flour, and exchanged merchandise for flour, and notes payable in flour, which flour Baird intended to deliver to Carney & Stevens under said agreement. Baird delivered no flour under said agreement at the time of making the same, nor at any time thereafter, nor was any of said flour at any time delivered by any other person under his agreement. At or about the same time of making said agreement with Baird, Stevens, in the name of Carney & Stevens, for the purpose of transporting such flour so agreed to be sold and delivered by Baird, to Helena, Montana, for sale, entered into an agreement in writing with Page & Salisbury, freighters at Salt Lake City, to transport the flour so to be sold and delivered by Baird to Helena, in quantity from 4,000 to 5,000 sacks, and not less than 4,000 sacks, for which transportation it was agreed they should be paid 8½ cents per pound in good, clean gold dust, payable as such flour should be delivered in Helena, Montana, aforesaid. *Stevens intended that the agreement with Baird for the purchase of such flour, and the agreement with Page & Salisbury for the transportation of the same, should be for the benefit of the plaintiffs, and defendants Carney & Stevens;* but his intentions and purposes were not disclosed to Baird at the time said agreements were made. Soon after making said agreements, Stevens returned to Leavenworth city, and reported said agreement with Page & Salisbury for the transportation of the same to Helena to plaintiffs and Thomas Carney, and his acts *in that behalf were by both ratified and confirmed. Carney and Stevens agreed, and it was understood, that any moneys received by them from Baird and Baird & Rively, applicable to the payment of their debt and claim against the same, should be divided and shared by and between Carney & Stevens, and the plaintiffs, pro rata, in proportion to the claim of each against Baird & Rively.*

9th.—On or about the 1st of April 1866, the said Baird, who was then embarrassed, and unable to pay his debts as they became due, sold to one F. H. Lewis, then a clerk in his store in Salt Lake City, the undivided one-half of his stock-in-trade, goods, and merchandise, for the price of $17,353.90, and in payment therefor took the promissory note of said Lewis. Included in the stock-in-trade so sold to Lewis, was the flour in store procured by Baird to that time, which he had intended to deliver to Carney & Stevens under

the assignment before mentioned.   At or about the time of such sale to Lewis, Baird executed and delivered to him a power of attorney, authorizing him to carry on such mercantile business on behalf of said Baird, to collect debts due him, and to sell such goods and merchandise, and stock-in-trade, and to sell and dispose of all his property in Salt Lake City, as the said Lewis might see fit; and on the strength of such power of attorney Baird delivered to Lewis the entire stock-in-trade, goods, and accounts, books of account, evidences of debt, and choses in action belonging to himself alone, and to himself and said Lewis jointly in Salt Lake City, except the promissory note of Lewis, given in the purchase of his interest in such stock-in-trade, and immediately thereafter left Salt Lake City, and did not return thereto prior to the 24th of December 1866.

10th.—On the 23d of April 1866, said F. H. Lewis, for himself, and as the attorney-in-fact for Baird, assigned to Carney & Stevens all the goods, chattels, and stock-in-trade of himself and said Baird, and the notes, accounts, and choses in action of said Baird, in his possession or under his control, on the condition and agreement that he, the said Lewis, should be indemnified and saved harmless from and against his promissory note given to Baird for the price of the undivided one-half of said goods, merchandise, and stock-in-trade, and on the further condition that he should be paid the sum of about $2,000 claimed by him against said Baird. Carney & Stevens, and A. Stettauer, one of the plaintiffs, jointly executed and delivered to Lewis a bond of indemnity, by which they agreed and bound themselves to keep and save the said Lewis harmless as against said promissory note so given by Lewis to Baird.   In the body of said bond the name of Stettauer & Bros. appears as the co-obligors with Carney & Stevens, but the name Stettauer & Bros. is not signed to said bond.   Said bond of indemnity bears date 17th June 1866.   Immediately after the execution of such assignment by Lewis, Carney & Stevens, by Joseph Nounan their agent in Salt Lake City, took possession of such assigned property, and commenced the collection of the debts, dues, and demands, and the sale of the assigned goods, merchandise, and stock-in-trade at private sale.

11th.—Such assignment was in trust, for the purpose of collecting the debts, dues, and demands and choses in action, and for a sale of the goods, chattels, merchandise, and stock-

in-trade, and the conversion of the same into money, and from and with the proceeds of such sales and collections, after paying the costs, expenses, and charges of executing the said trust, of paying the creditors of Baird and Baird & Rively in the order following: *First*, Nounan, Orr & Co., claim against Baird; J. W. Kerr, claim against Baird; C. H. Hempstead, claim against Baird; F. H. Lewis, claim against Baird; Carney & Stevens, claim against Baird & Rively. *Second*, All of the other creditors of said Baird, and Baird & Rively, including the plaintiffs in this action. The plaintiffs had no actual knowledge of the terms of said assignment, further than that it was made to pay the debts of Baird, and Baird & Rively.

12th.—No attempt to sell the assigned stock-in-trade and merchandise was made, other than at private sale. During the spring and summer of 1866, goods and merchandise of the character and kind of those assigned by Lewis to Carney & Stevens decreased in value in Salt Lake City; but sales of assigned property were made for cash, and could have been further made for cash.

13th.—On the 15th of May 1866, Nounan, as the agent of Carney & Stevens, shipped at Salt Lake City, of the flour assigned by Lewis, and of flour collected on notes and due-bills payable in flour, for Helena, Montana, for sale, by Page & Salisbury's trains, under the agreement for freighting before mentioned, 1,488 sacks of flour, worth in Salt Lake City $7 per sack. Neither Thomas Carney, nor the plaintiffs, had any actual notice or knowledge that such shipment was intended to be made by Nounan before it was made, nor until some time thereafter; but no objection was made, thereto by Carney, or the plaintiffs, after they were advised of such shipment.

14th.—Nounan, as the agent of Carney & Stevens, continued to sell at private sale the goods and merchandise so assigned, and to exchange and trade portions thereof for flour, salt, barley, wood and coal, until about the 20th of ———— 1866, on which day he sold the balance and remainder of such assigned goods, merchandise, and stock-in-trade to McGonty & Harvey, for the sum of $9,448.76, and in payment therefor took their promissory notes, amounting, in the aggregate, to the sum last mentioned, all payable to the order of Carney & Stevens. Afterward, and on or about the 1st of September 1866, Nounan and Thomas C. Stevens

traded and exchanged said notes for 1,500 sacks of flour, and then exchanged a portion thereof for barley, and shipped such flour and barley to Helena, Montana, for sale, by Page & Salisbury's trains, under the freighting contract with them before mentioned. During the spring and summer of 1866 Nounan traded and exchanged portions of the assigned goods for flour, salt, wood and coal, and sold portions thereof in Salt Lake City, which flour, barley, and salt which remained unsold was shipped to Helena, with the flour received in exchange for McGonty & Harvey's notes; and the last and final shipment to Montana was made on the 11th of October 1866. Neither Thomas Carney, nor the plaintiffs, had actual notice or knowledge of the intended sale to McGonty & Harvey before it was made; nor of the intended exchange of their said notes for flour, before such exchange was made. On or about the 20th of September 1866, Stevens wrote, in his individual name, to the plaintiffs, that all the assigned goods had been disposed of, and that there was on hand a quantity of flour, salt, barley, wood and coal, and that such flour, salt and barley were being shipped to Helena for sale. Said letter was shown by plaintiffs to Thomas Carney, and was the first actual knowledge either had of the final sale of such assigned stock-in-trade, goods, and merchandise, and the shipment or intended shipment of the flour, barley, and salt on hand to Helena for sale, and neither objected thereto. (Said letter is given in full in the 17th finding of fact in this report.) The notes of McGonty & Harvey so received in payment of merchandise sold to them, as before mentioned, and transferred and exchanged for flour, was a note dated 20th August 1866, and payable at six months, to the order of Carney & Stevens. At the time McGonty & Harvey made such notes, they were in good credit, and considered responsible in Salt Lake City, but became insolvent before the note last mentioned became due, and have never paid the same, nor any part of it. Carney & Stevens, as the indorsers, were afterward compelled to pay the holder of said note the sum of $2,449.86, the amount of principal, interest, and costs claimed thereon. If the plaintiffs were or are liable to Carney & Stevens for any part of the money so paid, the per cent. and *pro rata* thereof, is the sum of $678.89. The goods and merchandise shipped on the 11th of October 1866, did not arrive in Helena until the spring of 1867. After the last-mentioned shipment, no part of the assigned goods,

chattels, and merchandise remained in the hands of Carney & Stevens, in Salt Lake City, nor had they any of the property at that place which had been received on collections, or sales, or exchange of assigned property, except a quantity of wood and coal, which had cost Carney & Stevens the sum of $——— in merchandise, and which was afterward sold by Nounan for $976.66, and the proceeds applied by him upon his claim for services as the agent of Carney & Stevens, as such assignee.

15th.—All of the assigned goods, merchandise, and stock-in-trade had been sold or exchanged for flour, salt, wood and coal before the 1st of September 1866.

16th.—In the fall or summer of 1866, Baird caused the promissory note given by Lewis to him for the purchase-price of the stock-in-trade before mentioned to be sued in the name of E. B. Shaffer, in a court in Utah Territory, which suit was pending on the 24th of December 1866, of which Carney & Stevens, and the plaintiffs, had notice before said day.

17th.—On the 18th of September 1866, Thomas C. Stevens was in Salt Lake City, and thence wrote and sent to the plaintiff a letter, of which the following is a copy:

BANKING HOUSE OF J. NOUNAN, ORR & Co.,
GREAT SALT LAKE CITY, UTAH, September 18th, 1866.

MESSRS. STETTAUER & BROS.—*Gentlemen:* I arrived here yesterday, after a short and pleasant trip across the plains. Find things very dull here, and money extremely close. I saw Mr. Hempstead, our attorney in the Baird matter, and he will have the notice served as soon as he can to take depositions in Leavenworth. He feels confident of beating the note, and I have examined the affairs of Baird & Rively, and think it will pay your claim and ours, and leave a surplus, perhaps enough to pay the note, and some to Tichenor, Rowe & Co. Don't force yours off. It will bring one hundred cents, and interest. If I were in Leavenworth I would buy some of these claims, if I could do so at 25 to 40 per cent., and pay in my notes at six months; and if you can buy Woodruff's and Thomas Keysen & Co.'s, at not to exceed 40 per cent., do so, and I will return my note at six months, without interest. The goods are all sold, and will have some 400 cords of wood, some notes, and 1,500 sacks of flour, which I am shipping to Montana by Page & Salisbury's trains, and as soon as it is sold, and the bills receivable collected, I will forward you your money; and I feel confident of being able to do so in full. If we could get Baird to assign the note, and stop litigation, (which is expensive here,) it would be a good move. Try him, and write me. I will remain here some two weeks before going to the mountains. Trade is very dull out here, and prices low. I hope to be able to forward some money soon. My best regards to all.

Your friend, truly, THOMAS C. STEVENS.

And also, a letter, of which the following is a copy:

BANKING HOUSE OF NOUNAN, ORR & Co.,
GREAT SALT LAKE CITY, Sept. 20th, 1866.

MESSRS. STETTAUER BROS., Leavenworth, Kas.—*Gentlemen:* Mr. F. H. Lewis leaves to-morrow for the east, on a mule train, with his family. He

will go to Leavenworth, and I shall give him a letter of introduction to you, and Carney. I want you to show him every attention, and treat him the best you know how, as we will want his depositions, and will want Judge McDowell to talk with him, and see that Baird or ———— do not get hold of him; ———— of whisky, and your tittle-tattle, will make him satisfied. You will know how to manage him, and do your prettiest. It would save a vast amount of trouble and expense if we could get Baird to sanction all that Lewis has done in making the assignment, and selling the goods, and paying the debts here, which we have done. See Billy McD——, and have him see Baird, and you and him use a little coaxing, threats, etc., etc., and get Baird to sanction the assignment, and all we have done, and the note-suit stopped. You can use Lewis as you want to by getting on the right side of him, which is easy done. He is mad at Baird for getting him in the scrape he has, and you can work upon his feelings on that key.

Goods low and trade dull. We shall leave a portion of Mott's goods here, and the balance in Montana. Write me often.

Respectfully,      THOMAS C. STEVENS.

Carney was advised of the contents of said letters. On the 24th of December 1866 Carney & Stevens and William H. Baird executed the agreement of that date, a copy of which is given in plaintiffs' petition. Said agreement was procured to be executed on the part of Baird, mainly by the plaintiffs, and William C. McDowell the attorney named in the letters of said Stevens, and was intended by the plaintiffs, and Thomas Carney, acting for Carney & Stevens, for the purposes mentioned in the said letters of Thomas C. Stevens, copies of which are above given, and for the further purpose of facilitating the collection of their said claims against Baird & Rively. At the time of the execution of the last-mentioned agreement, Carney & Stevens, and the plaintiffs, knew that the assigned goods and merchandise had been disposed of for cash, or credit, or sold for notes, or exchanged for flour, barley, wood and coal, and that notes taken for goods had been exchanged for flour, and that all the flour, salt and barley received in exchange for assigned property had been shipped to Helena, Montana, for sale; and the plaintiffs and Carney were advised by the said letter from Stevens of the dealings of Stevens, and Nounan, as the agent of Carney & Stevens, with the assigned property, the said shipments to Helena, relying upon the statements there made, and made no objections thereto, but acquiesced therein. Neither Thomas Carney nor either of the plaintiffs were in Salt Lake City during the year 1866. At the time of the execution of the agreement of Dec. 24th 1866, said Baird knew that Lewis had made the assignment to Carney & Stevens before mentioned, and that the property assigned by Lewis had gone into the possession of Carney & Stevens. On the 24th of

December 1866, a part of the flour shipped had arrived in Helena, and the balance of the flour and the salt and barley did not arrive until the spring of 1867; and all such produce so shipped was then subject to charges for freight, pursuant to the freighting-agreement between Page & Salisbury and Carney & Stevens. In the spring of 1866, flour was worth in the Helena market about $22 per sack, but there was a rapid decline in price during the summer, winter and spring following. The following debts were outstanding against Baird & Rively on the 24th of December 1866: Stettauer Bros., plaintiffs, $8,893.23; Carney & Stevens, defendants, $24,696.77; First National Bank, $2,800; and the said last-named creditors, and Baird, were the only persons, firms and corporations then interested in said assigned property, or the proceeds thereof. Carney and Stevens paid to Baird $2,000, the consideration expressed in said agreement with him of 24th December 1866, at the time of the execution, and were by it authorized to retain said amount of money from the proceeds of such assigned property. At all times before said December 24th, Stevens believed that sufficient money would be realized from such assigned property, or the proceeds of that exchanged therefor, to pay the last-mentioned debts, and so advised the plaintiffs; and said Carney and they, relying upon the advices of said Stevens, believed at the time of execution of the last-mentioned agreement, that their said debts and claim against Baird & Rively would be paid in full from the proceeds of such assigned property.

18th.—All of the assigned goods and chattels had been disposed of, and the choses in action collected, which were collectible before the commencement of this suit.

19th.—Carney & Stevens collected, in money, on the assigned notes, accounts and choses in action, the sum of $4,936.14. They received in cash from sales, $11,080.45. They collected 936 sacks of flour on notes payable in flour, included in shipments to Helena, on 15th May 1866, worth in Salt Lake City $7 per sack, $6,552. The remainder of the assigned stock-in-trade, which was exchanged for flour and other produce, as before mentioned, is the sum of $15,265. The goods and merchandise last mentioned were exchanged for flour, salt, barley, wood and coal, or sold for notes, and the notes traded for like produce; and the value of such merchandise, when so exchanged, was the sum last mentioned. (Schedule "A" hereof, is a statement of such merchandise, and the value of the same.)

20th.— Carney & Stevens expended in executing the trust created by said assignment, in rent, clerk and agents' hire, with the money paid to Baird 24th Dec. 1866, $7,600; and ten per cent. commission is a fair and reasonable allowance for their personal services and expenses in executing such trusts. (Schedule "B" is a statement of the items of claims and allowances mentioned in this finding.)

21st.—Prior to December 1866, Carney & Stevens had paid in full the debts preferred in the first class of said assignment, except their own debt, and such payments amount in the aggregate to the sum of $8,865.80. (Schedule "C" is a statement of such debts paid.)

22d.—The balance of the assigned property in the hands of Carney & Stevens, charging them with the value of the 936 sacks of flour shipped to Helena in May 1866, and the value of the goods and merchandise sold for flour and promissory notes, is the sum of $18,334.20; and if the plaintiffs are entitled to a distribution of the net proceeds of such assigned property, the distribution then of the plaintiffs, pursuant to the provisions of the agreement of 20th December 1866, is the sum of $4,446.63.

23d.—All of the produce so sent and shipped to Helena was sold prior to the 1st of June 1868; and all the proceeds of such sales of such produce were not sufficient to pay the freight and charges of storage and commission, and Carney & Stevens expended of their own money, in paying the balance of such freights, storage and commissions, the sum of $14,275.58, over and above all the moneys received from and as the proceeds of such produce shipped to Helena; but the plaintiffs had no notice or knowledge that such payments were to be made before the same were made, and have never been called upon to pay any part thereof until the filing of the answer of Carney & Stevens. If the plaintiffs are liable to Carney & Stevens to contribute to the money so expended over and above the proceeds of such sales, I find that the per cent. and *pro rata*, when to be contributed by them, is the sum of $3,954.33.

24th.—No portion of the advancement made by Carney & Stevens mentioned in the 14th finding was ever claimed by Carney & Stevens from the plaintiffs till the filing of their answer in this cause; and such advancement, and their loss sustained in the shipment of the goods to Montana, was charged to profit and loss on the books of Carney & Stevens; and they never were charged to the plaintiffs on their books,

any loss or expense, or gave them credit for any receipts, nor rendered them any account, beyond placing in their possession the books of the business transactions in Salt Lake City, under such assignment.

25th.–After the commencement of this suit, Carney & Stevens settled with said Baird for and on account of the matters and things and claims alleged and stated by him in his answer, and paid him the sum of $1,500, in satisfaction and discharge of such claims.

26th.–The only account kept on the books of Carney & Stevens, at Leavenworth, of the adventure and shipment to Montana, were entries, under the title of "Montana Adventure Account," which account was a statement of produce shipped, value or costs thereof, and proceeds in money received by Carney & Stevens.

The contract of 24th December 1866, referred to in above findings, is as follows:

"WHEREAS, W. H. Baird, of Leavenworth city, sold an interest at Salt Lake City, in a stock of goods, wares, groceries, and merchandise, which said Baird took from Leavenworth to Salt Lake City, to F. H. Lewis, of said Salt Lake City, and as to the residue of said Baird's assets, said Lewis was appointed by said Baird as his attorney-in-fact, to dispose of the same as Lewis should see fit. *And whereas,* said Lewis gave to said Baird in payment of interest so bought by Lewis of Baird a note being for $17,352.90. *And whereas,* said note is in suit in Salt Lake City, in a case where one E. B. Shaffer is plaintiff, and said Lewis defendant. *And whereas,* said Baird is indebted to Carney & Stevens, of Leavenworth, to the amount of $24,696.77, and interest; and indebted to Stettauer & Bros., of same place, in the sum of $8,893.23, and interest. *And whereas,* said Baird owes at First National Bank of Leavenworth, $2,800, evidenced by note indorsed by T. C. Stevens. *And whereas,* said Baird has goods, assets and effects in Salt Lake City, including the interest sold to Lewis, supposed in all to be worth some $40,000, more or less. Now, this agreement, made and entered into this 24th of December 1866, by said Carney & Stevens, and W. H. Baird, witnesseth: that in consideration of the payment to said Baird by said Carney & Stevens, on the signing of this agreement, $2,000 cash, the said Baird binds himself to have the suit aforementioned dismissed, and to deliver to said Carney & Stevens, or their agent at Salt Lake, the note

aforesaid, and to suffer said Carney & Stevens to reduce said assets aforementioned at once to money. It is also understood and agreed, that said Carney & Stevens are to pay out of the proceeds of said assets, the debts and interest herein mentioned of said Baird, and any and all proper costs, expenses, and charges connected herewith, and to repay themselves the $2,000 herein to be paid said Baird; and the balance of the money arising from said assets, if any, is to be paid by Carney & Stevens to said Baird. The said Carney & Stevens are to keep an account of all their doings and proceedings herein, an inspection of which is at any time to be allowed said Baird.

"In witness whereof, the parties hereto set their hands this 24th December 1866.　　　　　　　CARNEY & STEVENS.
W. H. BAIRD."

It is apparent from the 8th finding, that in making the arrangement with Baird · for flour, and the contract with Paige & Salisbury for transportation, Stevens was acting for and on behalf of plaintiffs and defendants alike, that his actions therein were disclosed to each, and by each approved. Whatever therefore had been the result, whether profit or loss, was the profit or loss of each. And each was equally bound by the contracts entered into. The contract for transportation, if not performed, subjected the party breaking it to damages for non-performance. If Paige & Salisbury had broken it, and Stevens had recovered damages for the breach, clearly plaintiffs would have been entitled to share *pro rata* therein. If Stevens had broken it, and been mulcted in damages, the plaintiffs were bound to share the loss. It was a joint venture, entered into by the agent of both, for the benefit of both, and approved by both. Looking backward, it seems a foolish venture; but results do not change the obligations of contracts. Each at the time doubtless thought it wise and prudent. At least, each assumed the risk.

Thus far the questions are easy, and the case clear. The difficulty arises in determining the character of the subsequent transactions by which the assets of Baird were secured and converted into grain, etc. If all this was but the carry-

ing out of the first arrangement, and the various steps but means deemed necessary to accomplish that which was temporarily frustrated by the failure of Baird to perform his agreement with Stevens, then it remained still the joint venture of plaintiffs and defendants, and the results were binding upon each alike. So also, if by Baird's failure the original plan was by all parties considered abandoned, yet if the subsequent measures to obtain and convert the assets of Baird into cash were done for the benefit of plaintiffs and defendants alike, accepted and ratified by both parties as done on their joint account, the same conclusion follows. On the other hand, if the original arrangements were ended, either through Baird's failure, or by the action of the parties hereto, and the defendants subsequently procured an assignment of the stock of goods primarily for their own benefit, and only secondarily and incidentally for the benefit of plaintiffs, and assumed charge of the assigned property, with the full responsibility of assignees charged with the duty of converting the assigned property into cash as speedily and conveniently as possible, and of paying the creditors as specified in the deed of assignment, then it becomes a very serious question whether the Montana venture was such an one as an assignee could make except at his own risk. An assignee cannot speculate with assigned property, save at his own risk. Neither can he engage in business ventures at remote places, and of doubtful results, without rendering himself personally liable for any untoward results. If the defendants are to be regarded solely as assignees, or trustees, of this property, and in its disposition occupying no other relation to the plaintiffs, or invested by them with no other powers than those of assignees, it would seem as though the Montana venture must be charged to their personal account.

It seems to us, after a careful examination of the facts as found by the referee, that the parties must be considered as jointly interested in the Montana venture, and as jointly bound by the results. These are the reasons which lead to this conclusion: Stevens went out to Utah, representing both

32—20 KAS.

plaintiffs and defendants, and for the purpose of collecting the claims of both against Baird. The first arrangement he consummated involved the payment of the plaintiffs' claim in flour, which payment was to be shared in by both parties, and the shipment of the flour to Montana. For this purpose, binding contracts were entered into. This arrangement, involving both the payment in flour and the shipment to Montana, and the contracts therefor, were all disclosed to plaintiffs and defendants alike; and his action in that behalf fully ratified. Plaintiffs and defendants were therefore alike committed to that venture. If the findings ended there, we should, as heretofore stated, have no doubt. We see nothing in the further findings indicating any abandonment by the plaintiffs, or any unwillingness on their part to have this venture carried through. It appears from the 13th finding, that the first shipment was made 15th May 1866, the original arrangement having been made in February prior; that notice of this shipment was given to plaintiffs, and no objection made by them thereto; and by the 14th and 17th findings, that, after all the assets had been converted into flour, etc., and the last shipment made, the plaintiffs, with full knowledge, "made no objections thereto, but acquiesced therein." Bearing in mind that plaintiffs were cognizant of and had ratified the original arrangement by which the claims of both plaintiffs and defendants were to be at least partially paid out of the assets of Baird in flour, and the flour to be shipped to Montana, and to carry out which a valid shipping-contract had been entered into, binding upon plaintiffs equally with defendants, and that the assets of Baird were in fact converted into flour, salt, and barley, and in fact shipped under said contract to Montana, it would seem that when the plaintiffs with full knowledge acquiesced in this conversion and shipment they were recognizing the fact of a joint venture. It is clear, that where parties once unite in a venture, and that venture is finally carried through, the presumption is that the parties continue interested in it to the end. The character of the transaction at the close is determined by the under-

standing and agreement at the commencement. And this presumption of continuance in interest, is not destroyed by any change in means, or detail, so long as the general features and essential plan remain the same. Here the essential facts were, the conversion of the assets of Baird into grain at Salt Lake City, and its shipment to Montana. At first, the conversion was to be by the voluntary act and assistance of Baird, and only to the extent of the defendants' claim. It was finally wrought out by securing possession of the entire assets and converting them into grain for the payment of the claims of both parties. This was attended with some expense, and by assuming the burden of other indebtedness of Baird. But still, these assets were the property out of which plaintiffs' and defendants' claims were to be paid. The manner of securing them depended on the necessities of the case, and the means employed were fully communicated to both parties, and by both approved.

Again, look at it from another standpoint. By the 7th finding it appears that plaintiffs made Stevens their agent, giving him a power of attorney, and also an assignment of their claim. Such power of attorney is as follows:

"KNOW ALL MEN by these presents, that we, Charles Stettauer, Abraham Stettauer, Lewis Stettauer, and David Stettauer, doing business under the name and firm of Stettauer Bros., at Leavenworth city, Kansas, do hereby make, constitute and appoint, as our true and lawful attorney-in-fact, Thomas C. Stevens, of Leavenworth city, for us and in our name, to settle a claim in our favor against the firm of Baird & Rively, with said firm, or the surviving partner thereof, said claim amounting to the sum of $8,859.48; to receive from said firm, or the survivor thereof, the said sum of money, and receipt therefor, or to settle and adjust the same as to our said attorney shall seem to our interest; and as to ————, and intending to give unto our said attorney the same powers in case we ourselves might lawfully exercise if personally present, hereby ratifying and confirming all our said attorney may lawfully do by virtue of these presents.

"In testimony whereof, the said parties hereto set their hands this 6th of September 1865. STETTAUER BROS."

Now were this action one against Stevens alone, as their

agent, could it be maintained? Could they recover the value of the goods received at Salt Lake City, after ratifying his actions in making a contract for shipment to Montana, and making no objections but acquiescing in the means used to obtain possession of the goods, and in the actual shipment? If Carney & Stevens had been insolvent, could plaintiffs have avoided payment of Paige & Salisbury's bill, on the ground that Stevens had exceeded his authority? Could not Paige & Salisbury have held them, equally with Carney & Stevens? Was this agency of Stevens' ever revoked? Did he ever cease to act for them during the whole transaction? And was there a single act done by him which they, when informed of, objected to? Looking at it simply in the light of agency: the agent, armed with general authority, adopts certain means to realize his principal's claim; the means are approved of by the principal; they prove a failure, and loss results: who bears the loss, the principal, or the agent? Does it change the rule, that the agent is at the same time and by the same means seeking to collect of the same party a claim of his own? Of course, in some cases questions of good faith on the part of the agent might arise; but there are none such in this case. It nowhere appears that any of the parties acted other than in the best of faith; and all believed, until after the last shipment, in the success of the venture.

It will be noticed that the arrangement made in the first instance with Baird, only involved the payment of defendants' claim. Whether Baird would have made a similar arrangement to include plaintiffs' claim, we are not advised. And the amount thus secured in payment of defendants' claim was the amount to be divided *pro rata*. Though the assignment made thereafter was charged with some prior indebtedness, yet it involved a transfer of the entire assets of Baird, and was for the benefit of both plaintiffs' and defendants' claims, and was by both parties deemed ample for their payment in full. This only shows additional reason for the plaintiffs' willingness to continue in the venture. As against this, it may be said that the entire dealings with Baird, and

in the Montana shipment, were in the names of defendants. To this we reply, that at the outset the claim of plaintiffs was assigned to defendant Stevens, and stood in his name during the entire time. Again, it is always competent to go behind the face of the papers, and show who are the real parties. And further, the first arrangement with Baird, and the shipping-contract, were in the name of defendants; but the referee finds expressly that they were intended for the benefit of both parties; that the form in which they were made was approved by both parties; (see 8th finding;) and that after they had been made, the parties agreed that any moneys received should be divided *pro rata*. The continued use of the name of Carney & Stevens only indicates a continuance of the original arrangement.

Further: It is said that the assignment which was made, preferred defendants, as creditors of Baird, to plaintiffs, and that this indicates that defendants were ignoring their agreements with plaintiffs, and seeking to secure their own claim in preference to that of plaintiffs, and that therefore, from that time on, the relations of the parties must be determined by the assignment. It must be conceded that this makes against the claim of a joint venture, and is the strongest fact in the case against it. For it does not seem reasonable, that plaintiffs would engage in a venture the profits of which would in the first place inure solely to the benefit of the defendants, and profit them only after the defendants had been fully paid. But it will be noticed that this assignment was taken after Stevens had left Salt Lake City; that it was taken by parties who are not shown to have known of the fact that Stevens was representing both plaintiffs and defendants; that there was in fact an agreement between plaintiffs and defendants that their claims should be paid *pro rata;* and that as the personal management of the matter was by both parties placed in Stevens' hands, they may well have left the details unchallenged, content to abide the final result. Not merely was there the original agreement to share *pro rata*, but the subsequent contract of 24th December 1866 seems to recog-

nize and reaffirm this arrangement. Indeed, the learned referee finds, as one of his conclusions of law, that any preference to defendants given by the assignment was waived by this contract, and the parties were to share *pro rata* as per the first agreement. We conclude then, that the plaintiffs were bound by the acts of their agent, Stevens, and were jointly interested in the Montana venture, entitled to share *pro rata* its profits, and liable *pro rata* for its losses. We think therefore, that plaintiffs are liable to defendants for the amount specified in the 23d finding, $3,954.33, as well as for the amount specified in the 14th finding, $678.89; and also for a *pro rata* share of the excess of their expenditures as stated by the referee over their receipts, to-wit, the amount of $118.93, or a total of $4,752.15.

Counsel for defendants claim interest. The act in force at the time of these transactions was the law of 1863, (laws of 1863, p. 63.) The only clause under which interest could be claimed was that which allowed interest "for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts." We cannot say, under the findings in this case, that there has been such an unreasonable and vexatious delay as calls for the allowance of interest. The plaintiffs honestly believed themselves entitled to recover of the defendants, and they commenced their action therefor. The referee thought they were entitled to maintain their action. Evidently, the questions are not so clear, and the liability so patent, that it can be said their delay was unreasonable and vexatious. It would not be just, after the close of this protracted litigation, to compel them to pay interest during all these years. Ordinarily, and primarily too, the question whether the delay has been unreasonable and vexatious is one of fact, to be settled by the triers of fact. *McLean v. Thorp*, 4 Mo. 256. Here there is no such finding; and we cannot as matter of law say that the facts found show a delay both unreasonable and vexatious; and it must be both, to bring the case within the statute.

*Interest, when not recoverable.*

The remaining question is one of practice. The record below contains the pleadings, the report of the referee, and the judgment. The testimony was not preserved. And as the record stands, the only inquiry we can make is, as to the judgment which should be entered upon the facts found. The referee thought that upon the facts the plaintiffs were entitled to a judgment for something over four thousand dollars. The district court held that plaintiffs were not so entitled, and rendered judgment for defendants for costs. It seems to us that defendants are entitled to recover. Now upon the single record, the plaintiffs have filed a petition in error, and the defendants a cross-petition in error, each alleging that upon the facts as reported by the referee the district court erred adversely to them in its judgment. Will such cross-petition in error lie, or must there be a separate suit in error brought by the defendants? In the case of *Bedell v. National Bank*, 16 Kas. 130, 133, we expressed an opinion adversely to the right of a party to file a cross-petition in error. The question was in that case of minor importance, and not fully examined. Our attention was again called to the matter in the case of *Hannon v. Houston*, 18 Kas. 561, and the subject reëxamined, though as the case finally turned, no reference to the question was deemed necessary in the opinion. It is brought before us again in this case, and under such circumstances that we are compelled to pass upon it. Our attention has been called to the following authorities from the supreme court of Ohio: *Smetters v. Rainey*, 13 Ohio St. 568; *Smetters v. Rainey*, 14 Ohio St. 187; *Shinkle v. National Bank*, 22 Ohio St. 516; *Black v. Hill*, 29 Ohio St. 86. In the case in 22 Ohio St., *supra*, the question was distinctly presented, and in commenting upon it the court uses this language: "There is no good reason why cross-petitions in error should not be allowed equally as in original actions. They were allowed at common law, and there is nothing in the code which forbids their use. On the contrary, they are calculated to subserve a leading object of the code, namely, to avoid multiplicity of suits, and to ren-

*Practice in supreme court; cross-petition in error.*

der litigation simple, cheap, and speedy. In order to reverse
a judgment, the plaintiff in error must show not only that
the judgment is erroneous, but also that the error works a
prejudice to him. If it appears in the record that there is
error, not to his prejudice, but to the prejudice of the defend-
ant in error, there is no good reason why the latter should
not be allowed at once, the record and the parties all being
before the court, to ask and obtain the reversal or modifica-
tion of the judgment for his benefit. To summon the oppo-
site party, who is already in court, and to bring in a copy of
the record, a copy of which is already in court, would be a
useless labor, and involve an unnecessary expense and delay;
and to bring in and file with the petition in error the papers
in the original case, as the present law requires, would seem
to be impracticable, they already being in court." As the
law now requires the original "case-made" to be filed with
the petition in error, (laws of 1877, p. 243,) it would seem to
follow, that unless a cross-petition were permitted each party
would be compelled to prepare a "case-made," although con-
taining the same statements of the proceedings in the trial
court. It was decided in *Glass Co. v. Ludlum*, 8 Kas. 40,
that if the bill of exceptions, or case made, as presented by
the party aggrieved, does not state all the facts and the ex-
ceptions of both parties, it is the right of the other party to
have such facts or exceptions inserted. And by section 559,
Gen. Stat. 740, it is prescribed, that when the facts are agreed
to, or found by the court or referee, and it does not appear
that such findings are against the evidence, (which is the case
at bar,) this court shall send a mandate to the district court
directing it to render such judgment as it should have ren-
dered on the facts. How can this properly be done, when the
judgment should have been more in favor of the defendant
in error than it was, unless a cross-petition in error be per-
mitted? Otherwise, when the plaintiff-in-error's suit in
error is decided, the mandate must command an affirmance;
and then, in a subsequent suit in error, brought by the party
defendant-in-error in the first proceeding, the mandate must

command a reversal. And each of the mandates must, in compliance with the statute, be a direction of the judgment proper upon the facts. We are constrained to believe that in this respect the decisions of the supreme court of Ohio are the better exposition of the law; and the contrary decision of this court, in the case of *Bedell v. National Bank,* supra, is overruled.

The case will be remanded to the district court, with instructions to render judgment in favor of the defendants in error, upon the facts found by the referee, for the sum of $4,752.15.

All the Justices concurring.