Owen, C. J.
1. The case has been considered by us upon the facts found by the district court. While we have examined the evidence sufficiently to see that it tends to support these findings, we have not undertaken to determine its weight.
These facts, so far as they have engaged the consideration of this court and are involved in this opinion, may be more briefly summarized as follows :
John B. Purcell was bishop of the Roman Catholic diocese of Cincinnati from 1833 to 1855, and archbishop from that time to and after his assignment, in March, 1879. From 1837 to the time of such assignment, his brother, Edward Purcell, was priest, serving at the cathedral, and also, by appointment of the archbishop, vicar-general of the diocese, to whom was confided the general management and control of the financial affairs of the archbishop. During all the time above mentioned the canons, decrees, and rules of the Roman Catholic Church for the diocese required all property held and used for ecclesiastical purposes to be conveyed to the bishop or archbishop of the diocese by name, his heirs or assigns forever, to be held by him in trust for the uses for which it was acquired. In the manner and for the uses above stated, the churches, school houses, parochial residences, asylums, seminary and cemeteries involved in this controversy, were acquired and conveyed to “ John B. Purcell, his heirs and assigns forever,” because the rules and canons of the church required the legal title to be so vested, and for no other reasons. As soon as Edward Purcell came into the diocese, and in his capacity of *132 vicar-general, he began to receive money on deposit, (paying interest thereon) and loaning it out upon interest, all with the acquiescence of the archbishop, and so continued to receive money until the indebtedness so incurred amounted to more than $3,500,000, which has been assumed by John B. Purcell as his own.
Finding themselves without available means to pay this indebtedness, they made an assignment in insolvency to the plaintiff, before whom about $2,500,000 of indebtedness have been duly proved. It is only necessary to deal with the assignment of John B. Purcell. On March 11, 1879, the latter, in his individual capacity, made his assignment to Mannix in trust for the payment of his debts, of all his property which could at law or in equity be subjected to such payment, expressly excepting all property held by him in trust for others. No specific property was named or described in the deed; but in addition to the church property held in his own name, the assignor owned a large amount of property which had been deeded or devised to him unaffected by any trust, and which yras legally subject to the payment of his debts, and about which there is no controversy. All the church edifices involved in this controversy, except three, (which includes the ■cathedral) were severally bought, built and paid for wholly by the gifts of the members of the several congregations worshiping therein, respectively, and others, for the sole purpose of public religious worship therein. To the purchase and building of the three excepted as above, John B. and Edward Purcell advanced money by way of loan, (and otherwise than as gifts), which, as to the cathedral and St. Patrick’s Church in Cumminsville, has not been repaid. Except the money so advanced, these church buildings were paid for by contributions from members of the respective congregations, and others, and the legal title vested in the archbishop, to be by him held in trust for the use of the congregations, respectively, using them as places of public worship. The congregations of the several churches were composed • of men, women and children.of the Roman Catholic faith, worshiping and receiving the sacraments of the church therein.
*133 These congregations were not incorporated, nor organized under any law of the state, nor were they unincorporated associations whose members incurred any personal liability; although some of them had trustees appointed for purposes other than for control over the title to church property. Members could change from one church to another by change of residence, or from mere caprice. Taking a pew and paying the pew rates by a Roman Catholic constituted such person a member of the congregation. Upon leaving the church and going elsewhere, the membership ceased. The churches were open and free to all for purposes of public worship. The pastor of each congregation was appointed by the bishop and removed at his pleasure, but his salary was paid by the congregation ; and the pastor for the time being, with his congregation, had actual possession of the church. None of the congregations, nor any bodies of individuals representing them, were so organized as to be capable of holding the legal title to the church property. The other properties held and used for ecclesiastical purposes — asylums, schools, cemeteries (with the qualifying facts found by the court below concerning the property represented by the St. Joseph’s Cemetery Association, a part of which was subjected to the payment of creditors), were, like the churches, openly, notoriously, continuously, and exclusively possessed and used for the purposes for which they were acquired and deeded to the archbishop. But they were so possessed, used and managed by persons with whom it was impracticable to invest the legal title, by reason of the want of permanency in the personnel of their possession and .management.
2. The original action was brought by the assignee for the purpose of procuring a sale of all this property free of all clouds and incumbrances by reason of the assertion of the trusts and uses for which it is claimed the archbishop held it; the contention of the assignee being that (1) the debts before mentioned were not the individual debts of the archbishop, but contracted for diocesan purposes, and that the church property is justly chargeable with their payment, and this prior to all other charges upon the property; and (2) that the *134 archbishop was so far the absolute owner of the property— such was his dominion over it — that it is subject to the payment of even his general indebtedness, and passed by the deed of assignment to the assignee; that there was no trust of which the civil courts can take cognizance or assume control, or which can stand in the way of the ordinary course of administration of the assignment.
Except as to the claim of John G. Hendricks for improvements put upon the cathedral property, (which will be considered in another connection), the central and controlling question in the case is whether the church property, including all the property above mentioned, is liable for the debts of the archbishop, contracted as above, and passed to the assignee by the deed of assignment, and is now held by him to be applied to the extinguishment of the indebtedness proved before him. There are in all over two hundred pieces of church property in the diocese described in the petition of the assignee, but it was agreed by counsel upon the trial that fourteen different churches, institutions and properties, selected by them as representing the various questions of law and fact in the case, may be considered as representing all the property involved in the controversy.
The case is one of unusual magnitude and interest, as well in the questions as in the amount involved. It has received that consideration at our hands which its importance seemed to demand. We desire to acknowledge our obligation to the eminent counsel whose great learning, tireless research, and strong presentation of the case in all its varied aspects and complications, have so greatly assisted us in its consideration.
3. It will facilitate the consideration and disposition of this question to keep in mind a few fundamental facts and propositions which assume prominence a£ the threshold of the investigation. The archbishop, in his official capacity, has made no assignment. The diocese of Cincinnati has not gone into insolvency, nor have any of the churches or other institutions iuvolved in this controversy. We are not dealing with church debts, nor with the assets of the church. John B. Purcell/the individual, made an assignment in insolvency of all his indi *135 vidual property to an assignee to be by the latter applied to the payment of his individual debts. No property held by him in trust for others could, or was intended to, pass by deed of assignment. 1 Perry on Trusts, sections 334, 335, 336. This word “trust” is here employed in its legal sense, and is not intended to comprehend mere confidential relations or duties of which the civil courts may not take cognizance or assume control. All property subject, at law or in equity, to the payment of John B. Purcell’s debts, whether held nominally in trust or not, passed by the assignment to the plaintiff below. $o higher or better right or title to any of this property passed to the assignee than the assignor held. His creditors acquired no new rights or remedies in or against it by force of the assignment. The assignee simply represents them and their rights, which he has undertaken to enforce by the plain processes appointed by statute. They do not, in any sense, stand to the assigned property in the relation of purchasers. The beneficiaries of the property which the assignee is now seeking to subject to the payment of the assignor’s debts, are free to assert against the latter every right and claim which, before the assignment, they could have asserted against -the assignor. Morgan v. Kinney, 38 Ohio St. 610; Burrill on Assignments, §391.
The questions before us are very similar to those which would have arisen if John B. Purcell, claiming to be in possession of this property, had brought suit to quiet his alleged title against those who now assert the trust, or as if, claiming to be the unqualified owner in fee-simple, had brought his actions against them to recover possession of the several properties held by them. The practical and substantial subject of the present inquiry is, have these supposed beneficiaries an interest in this property which they can assert as superior to the right of John B. Purcell or his creditors to subject it to the payment of his debts? Another important consideration which should be kept in view, is that none of the defendants.are asking to have any trust performed or executed. They are simply standing upon the defensive — asking that the properties which they respectively speak for and represent, be left free from assault; *136 asking that the relations which have obtained between them and their archbishop concerning these properties since they were first respectively possessed and used by them, be permitted to continue uninterrupted and unaffected. Instead of asking that the execution of the trusts be decreed, they simply pray that their destruction may be averted. They are content that the legal title to this property should remain where, by all the canons of their church, it has for so many years been reposed; but they ask that*the uses to which, during all these years, it has been devoted, be not abused, perverted nor destroyed.
4. The parties have gone back fifteen centuries into the laws and cannons of the church for proof of the nature of the tenure by which the archbishop held the legal title to ecclesiastical property. And the proof is overwhelming that he was not invested with an absolute title to it as his own. It is practically conceded that he held it in trust; but the parties are very far from a concurrence of views concerning the terms of the trust. The right to go to the rules and canons of the Catholic Church for the purpose of establishing, defining and limiting the trust is denied. That parol evidence may be resorted to to engraft a trust upon a title held by deed absolute upon its face, is a question which in this state has passed beyond the range of serious discussion; though the proof in such cases should be clear, strong and convincing. Matthews v. Leaman, 24 Ohio St. 615; Broadrup v. Woodman, 27 Ohio St. 559. The contention is that to resort to the law of the church as proof upon which to qualify the absolute terms of the grant, is to permit the law of the church to supersede or dominate the civil law; and much sensitiveness is shown by eminent counsel upon this subject. There is here no ground for alarm. It is no innovation upon the law of evidence, in determining questions like the one at bar, to call, in aid of the civil tribunal, upon the law of the particular church involved for the purpose of determining the title to church property. It surely is not unreasonable in a case like the present, to hold one of the great prelates of the Church of Rome to the terms upon which, by the very law to which he has vowed his fealty, he *137 has consented to accept the legal title to property which is appointed to the uses of the church to whose service he has with mpst solemn unction dedicated his life. It is but a form of establishing, by convenient and very convincing proof, what entered into the contemplation of the parties to the grant at the time the title vested. It has been held that where a religious body becomes divided, and the right to the property is in conflict, the civil courts will consider and determine which of the divisions submits to the church, local and general. This division is entitled to the property. In determining which of the divisions has maintained the correct doctrine, the findings of the supreme ecclesiastical tribunal of the denomination in question is binding upon the-civil courts. McGinnis v. Watson, 41 Pa. St. 9; Ramsey’s Appeal, 88 Pa. St. 60; First Pres. Society v. Langley, Trustee, 25 Ohio St. 128; Ferraria v. Vasconcellos, 31 Ill. 25; 3 Am. & Eng. Ency. of Law, 235. So where a bequest is made for a church, to take effect whenever a congregation should be formed, the proper ecclesiastical authorities are the judges of the formation of such congregation. Fidelity Ins. Co.’s Appeal, 99 Pa. St. 443. If by the laws of a Masonic lodge the Master, or of an Odd Eellows5 lodge, the Noble Grand, was to be the repository of the legal title to all real property of the lodge, to be held in trust for its uses, would there be anything startling in the proposal to prove the law of the lodge in a controversy between the latter and its chief officer, involving the title to such property ? Yet in such case it could as well be contended that the courts were permitting the law of Freemasonry or Odd Fellowship to supersede the law of the state, as it can now be asserted that we are enforcing the canons and decrees of Rome. It is no more than establishing, by a form of proof which the courts have held to be competent, the terms upon which, by the convention of the parties, the title to church property was granted and accepted.
5. It is to be observed, however, that the court below was not limited to such evidence in determining whether any and what trust was raised upon the title which the archbishop held. Formal written declarations of trust, sworn pleadings in other *138 cases, and other written concessions of the archbishop made before any controversies like the present arose, were before the court to aid in the determination of this question. It is trug that from time to time during the archbishop’s service he exercised acts of apparent private ownership over property held for ecclesiastical uses. He sold property, received the proceeds, re-invested it in other property for church uses, executed mortgages upon property purchased, and received mortgages upon property sold. But so far as appears in the case, all this was done with the free acquiescence of the respective congregations and others interested in the property affected. There was evidence tending to show that the archbishop and his vicar-general represented to-depositors that the entire' church property was bound for re-payment of deposits as well as payment of interest. Counsel maintain that these representations charged such property with a liability to answer to such creditors. The court below very properly omitted to make a finding upon this evidence. The fact, if so found, would have been immaterial. The law will not permit a trustee thus tq talk away the trust estate. The infirmity of the argument lies in its assumption of the very proposition in controversy. If the archbishop’s control over church property was such that he could incumber it by his mere declarations, it was liable for his debts. He could not estop the cestuis qui trustent by his words. The latter were found by the court below to have been continuously in possession of the property.
It also appears that the congregations, through representative members, have, without objection from the archbishop, bonded and mortgaged church property in large sums. But prior to the transactions which led to the assignment, no occasion is shown where any collision or difference has arisen between the archbishop and any of the beneficiaries of the church property respecting its management or control. It has been reserved for, the case at bar to present for the first time in the administration of the archbishop, a condition of things which called upon the various beneficiaries to question his right or power, or that of his successor in title, the assignee, to *139 Interrupt or interfere without their consent, with their enjoyment of the uses to which the property has heretofore been devoted. This question is now fairly presented; and the nature of the trust upon which it is conceded the assignor held ■ the property, is, for the purpose of determining whether any ■and what control a court of chancery may assume or exercise over it, squarely presented for adjudication.
6. The contention of the creditors is that though the archbishop may not have held this property by an absolute, unqualified ownership, yet the vagueness of the alleged trust, the uncertainty and indefiniteness as to the cestuis qui trustent, together with the absence of all other persons capable of dealing with, acquiring, or incumbering the legal title to this property, necessarily left the holder of the legal title supreme in his power of disposition and control.
Let us once assume that John B. Purcell 'was a trustee of this property, and a solution of the question at bar is relieved •of much of the difficulty which would otherwise involve it.
Wherever there is a trustee there is necessarily a subject of the trust — the estate ; an object of the trust — the use, and a cestui qui trust — the beneficiary of the trust. A trust is where property is conferred upon and accepted by one person on the terms of holding, using or disposing of it for the benefit of another. Wherever such a trust is shown, it is cognizable by a court of equity. The law knows no trust which .simply binds the conscience. An alleged trust which is cognizable only in the court of morals or the forum of conscience, is no trust at all; it is an absurdity. The law does not acknowledge a trust over the exercise of which it will not, through its tribunals, assume control, to avert its destruction, perversion or abuse. Morice v. Bishop of Durham, 9 Ves. 400. It is true that in some cases alleged trusts may, as they •do, fail by reason of some hard rule of evidence which prevents their proof; but let them once be established, and the power of a court of equity to control their exercise is almost universally conceded.
This was among the earliest subjects of chancery jurisdiction. While it was for a time supposed that the statute of *140 uses — 43 Eliz.. — was the origin of this jurisdiction, it is now conceded that it ante-dated that statute, and is now freely exercised in states which do not regard that statute as in force within their jurisdiction. Urmy v. Wooden et al., 1 Ohio St. 160.
7. Indefiniteness in the number and identity of the alleged cestuis qui trustent is urged as conclusive against the assumption that this property is held upon any trust of which the courts, will take cognizance.
The cathedral and other church buildings have been, since their completion, actually and openly possessed and used by their respective priests and congregations; the schools by their pupils and teachers; the orphan asylum by the sisters of charity in charge and about four hundred orphans; and the grave yards, (except the part devoted by the court below to the payment of debts,) by those in charge who have daily devoted them to the burial of the dead. It is true that none of these have been incorporated or otherwise organized under any law of the state. Indeed, their immediate management and control have been in such hands as to illustrate that very principle or element of indefiniteness which has, for many centuries, been one of the controlling characteristics of a trust for charitable and pious uses. It is said that vagueness is, in some respects, essential to a good gift for a public charity, and that a public charity begins where uncertainty in the recipient begins. Fontain v. Ravenel, 17 How. 384; Saltonstall v. Sanders, 11 Allen, 456; Russell v. Allen, 107 U. S. 163; 3 Am. & Eng. Ency. of Law, 127; 2 Perry on Trusts, sec. 687. The individual recipients of the charity are constantly changing. For illustration, take the case of a congregation of one of the' churches in question. It may be that among those who comprise it there is not one member wdio worshipped there ten years ago. Yet it is in legal contemplation the same congregation. It is the congregation for whose uses, as a place of religious worship, the church has been from the first devoted. Its name and the location of its place of worship render its identification easy.
*141 8. Is it such an entity as that it may constitute a beneficiary to support a trust for a charitable use ? If these congregations and other beneficiaries are sufficiently tangible and substantial to have a standing in court, the question ought, it would seem, to be resolved in their favor. This seems to us a fair test of the question. Are they in court ? They are represented each by prominent members who answered below for themselves and the other members; the orphan asylum by prominent contributors to its establishment and support, with whom were associated several members of the catholic sisterhood in charge; the schools are similarly represented, and the cerne! eries by the St. Joseph’s Cemetery Association, incorporated since the assignment, to which the legal title has been conveyed by John B. Purcell, or whatever interest then remained in him. It is a well recognized practice for certain persons, belonging to a voluntary, unincorporated society, and having a common interest, to sue in behalf of themselves and others having a like interest, as part of the same society, for purposes common to all and beneficial to all. In Beatty v. Kurtz, 2 Peters, 566, several members of an unincorporated Lutheran congregation, having no trustees capable of holding the legal title to church property, were permitted to appear in court in behalf of themselves and others having like interests, for the purpose of preserving a trust in a lot set apart upon a town plat, “ for the Lutheran Church,” upon which they had established a place of. burial anj erected a school house, but the legal title to which was still in the heirs of the original proprietor. See also, Phila. Bap. Ass’n v. Smith, 3 Peters, 500; African M. E. Church v. Conover, 27 N. J. Eq. 159; Hullman v. Boncamp, 5 Ohio St. 242; 6 Ohio, 298; 7 Ohio, 218. It does not follow, however, that, in the light of the facts established in the court below, it would not have protected the uses for which the property was held, even if these beneficiaries had not been formally in court. But they are in court.
9. It is scarcely necessary to cite authority to show that the uses for which this property is held, are such as the courts will uphold. The education of the youth; the care, education .and nurture of orphans ; the religious instruction of the liv *142 ing and the decent repose of the dead, are among the most prominent and common objects of charitable trusts. 2 Perry on Trusts, Secs. 669, 700, 701, 706; 3 Am. & Eng. Ency. of Law, 122; Gerke v. Purcell, 25 Ohio St. 229, (where some of the property now in controversy is declared to be held in trust); McIntire v. City of Zanesville, 17 Ohio St. 352; Trustees v. Zanesville Canal Co., 9 Ohio, 287.
Surely this court ought not to be expected to declare that: the trusts in the case at bar are too vague or indefinite to be recognized by it after its decision in the two cases last cited. It there upheld and enforced a charitable bequest to an unincorporated association “ for the use and support of a poor-school which they are to establish for the use of the poor-children of the town of Zanesville;” the donee afterwards, becoming incorporated. Compared with such a use, the objects of the trusts in the ease at bar are simple and definite.
Lane J., in the case last cited, says concerning the extent of chancery jurisdiction over charities: “One of the earliest elements of every social community, upon its lawgivers, at the dawn of its civilization, is adequate protection to its property and institutions which subserve public uses, or are devoted to its elevation, or consecrated to its religious culture and sepulchers ; ” etc.
In Miller v. Teachout, 24 Ohio St. 425, this court sustained a bequest to an executor “ for the advancement and benefit of the Christian religion, to be applied in such manner as in his. judgment will best promote the object named.”
In Urmy v. Wooden, 1 Ohio St. 160, the court sustained a bequest to “ the poor and needy, fatherless, etc., of Jefferson and Madison townships, of the county aforesaid, to such poor( as are not able to support themselves, to be divided as my executors may deem proper without any partiality.” In Sowers v. Syrenius, 39 Ohio St. 29, it sustained a testamentay disposition “ for the preaching of the gospel of the blessed son of God, as taught by the people iioav knoAvn as the Disciples of Christ, the preaching to be avcII and faithfully done in Loraine county in Birmingham, and at Berlin in Erie county, Ohio.”
*143 In Williams v. First Pres. Society of Cincinnati, 1 Ohio St. 478, the court held that a deed to certain persons as “trustees for the presbyterian congregation of Cincinnati, and their successors forever, for the use, benefit and behoof of the congregation forever,” there being then but one such congregation, is not void for uncertainty as to the beneficiaries of the trust, although they were not then incorporated. This bears with much weight upon the questions at bar. In none of these cases could the beneficiaries assert any special pecuniary interest in the trust estate, but the uses upon which the legal title was conferred were recognized and enforced.
10. Much of the complication and difficulty in which the discussion of the present case has involved it, arises from an attempt to solve it by the tests which are usually applied to cases of alleged resulting trusts, and from a failure to mark the distinction between active trusts, where the nature of the trust is such as to render it necessary, for the purposes of the trust, that the legal title should remain in the trustee (who cannot be compelled to convey), and a passive trust, where the cestui qui trust has the right to be put in actual possession of the property, or the right to call upon the trustee to convey the legal estate, as the former may direct. Bispham’s Eq., sec. 50.
The distinction between resulting trusts and trusts for charitable or pious uses is almost as clear and as broad as that between legal and equitable estates. The foundation of a resulting trust is the payment, or the securing to be paid, by the cestui qui trust, out of his own means, the consideration of the conveyance, or some part thereof, at its completion. McGovern v. Knox, 21 Ohio St. 552. A resulting trust is to be performed or executed by the trustee by transferring the title to the cestui qui trust at his request. Millard v. Hathaway, 27 Cal. 119; 1 Perry on Trusts, sec. 165a.
No one seriously claims that the donors of the various charities now in question — those whose donations and contributions so largely comprise the funds to which they owe their existence — have a definable, pecuniary interest in, or claim upon, them- which is enforcible in any court. Indeed, no such claim is made in their behalf. Nor is any personal or pecun *144 iary interest asserted by or on behalf of those to whose uses they are being devoted. Their interest in them is limited to the enjoyment of these uses. As already observed, they are not seeking nor asking the enforcement or execution of any trusts in their behalf. The trusts which attach to these various properties have been and are still being performed and executed. Each day that public religious worship is held by, or the sacraments of the church adininistered to, members of the congregations of any of these churches therein ; ’ each day that pupils are instructed in the schools; that the orphans are sheltered and cared for in the asylum; that the cemeteries are opened to receive the dead, witnesses the performance of the trusts upon which they are held by the archbishop of the diocese. The prayer is-identical with that of the bill in Beatty v. Kurtz, 2 Peters, 566, supra, that they be left undisturbed in the enjoyment of the uses to which the property actually possessed by them has been so long devoted. In this view, the assumed difficulty or impracticability of enforcing these trusts disappears entirely as an element in the case.
Upon this feature of the case the eminent counsel for the assignee, among other things says :
“ Can the beneficiaries be the individuals who attend the church, or who constitute the so-called congregations ? Certainly not; as no private advantage can be claimed for them, nothing can pass to them, nor can they, as individuals, act in any capacity in relation to the property. They are not only not an incorporated body or association, but they never can be incorporated as a body and continue to be part of the Roman Catholic Church. Take away the bishop, and there can be no priest to manage the affairs of the Church, and there can be no Catholic Church without a priest. Take away the bishop and the Church is gone forever. The congregation no longer has an existence, and the property must descend to the heirs of the grantee in the deed, unless it is disposed of by the deed of the grantee himself.”
It is sufficient answer to this to say that it will be time to deal with such an aspect of the case when such a calamity overtakes the Church as the one suggested by counsel.
*145 We are not called upon to prophesy what this court would or ought to do with this property when, if ever, bishop, priests, churches and congregations are “ gone forever.” We are dealing with a present, acting bishop (the successor of Archbishop Purcell, deceased), with officiating priests, with living churches and with worshiping congregations. It is against a disaster quite as fatal as that supposed by counsel that the court is asked to interpose its restraint.
Instead of asking that the head of the Church of the diocese oonvey, or be divested of, the legal title, the beneficiaries ask that it remain in him upon the same trusts and for the same uses to which, from the first, it has been devoted. Indeed, it is quite indispensable to the existence of the trust that the legal title be held by some one other than the eestuis qui i/rystent, who are incapable, by reason of the indefiniteness which characterizes their personality, of holding it.
11. Was the dominion of the archbishop over this property .such as to render it subject, at law or iniquity, to the payment of his debts ? The debts are, almost, if not quite, exclusively, such as were contracted in the business of receiving money on deposit upon the terms of paying interest upon it while on deposit, and finally restoring the principal. It surely cannot be seriously claimed that this important branch of the banking business was within the terms or powers of the trust upon, which the property was held. It originated with, and was prosecuted exclusively by, the vicar-general, Edward Purcell. The archbishop stated, among other things upon this subject, that this business had its origin in the failure of the banks, and the desire of the depositors that Father Edward should take their money and keep it for them, they refusing any security, but trusting to his integrity and good faith ; and that he labored for them without compensation, to earn for them interest on their money. While the findings of the court below do not in form embrace one upon this subject, they are entirely inconsistent with any such power, as are also the conclusions of law. The member of the court below who prepared the opinion of the court (Smith, J.), in a very able *146 and exhaustive presentation of the reasons which prompted the judgment, says that “ most of the present indebtedness-grew out of his brother’s banking, business; receiving money on deposit, paying interest and lending it out on interest. The-canon law strictly forbade this to be done by ecclesiastics. All the canonists concur in this testimony. It could hardly be a debt of the trust when the authority creating and regulating the trust strictly forbade it.”
There is no serious attempt by any creditor to trace moneys deposited by him into any specified property. There was but. one fund. The book-keeping was crude and primitive. While-some money deposited must have gone into church property, donations must have gone to pay interest upon, and re-pay the principal of, deposits; but the controversy is chiefly between depositors who expected interest and finally their principal,, and those who gave without hope of either interest or principal, except as it came in the enjoyment of the uses to which the-property was devoted.
12. The theory that these are diocesan debts to be satisfied out of diocesan or general church property, is untenable. It is not made to appear in this case that a diocese is a body or an organization capable of owning property or of contracting debts. A diocese is the circuit or extent of a bishop’s jurisdiction ; the district in which a bishop exercises his ecclesiastical authority, but it has not been made to appear that it i-s constituted to hold either the legal or equitable estate in any property which is devoted to church purposes. Certainly no such party was summoned nor made its appearance in this cause,, and we have not heard of any complaint of a defect of parties, in the courts below. The legal title to all this property is in the bishop; while the equitable or beneficial interest is in the-several congregations and others for whose several uses-they are respectively held. There seems to be no room for another owner. There is no such triangular title as this theory assumes.
Each of these congregations and other beneficiaries is here-defending for itself and in its own rights. Each piece of property is held upon a separate trust, and for a distinct use. No. *147 warrant is shown for charging upon one the expense incurred on account of another.
In the case of Tuigg, Trustee v. Tracy, 104 Penn. St. 493, the right to charge upon one congregation of a Catholic church expenses incurred for the benefit of another, was under consideration in the light of the rules of the-church. They were under the same general canonical laws which prevailed in the diocese of Cincinnati. The court say: “Whether or not, therefore, Father Tracy, (who was pastor of St. Bridget’s congregation), paid and expended the money of St. Bridget’s as his own, in the St. Joseph’s Mission, at the instance and request of the bishop, is not important, as the bishop had no more right to pledge the credit of the congregation in an enterprise it had not undertaken or assumed, and in which it had no particular concern, or to divert the funds of the congregation from their use, than the pastor himself, and neither, it would seem, had any power.”
While this is not an adjudication of the power of the archbishop which controls us in the case at bar, it affords strong support to the finding of the court below, especially as the sources of information were practically the same in both cases.
Our conclusion is that the property sought to be subjected to the payment of the individual debts of John B. Purcell (except so much of the cemeteries as was devoted to such purposes), was “held in trust for others,” and did not pass to the assignee by the deed of assignment.
13. Some of the defendants and cross-petitioners acquired judgments upon their claims against John B. Purcell after the assignment, but we are not able to discover how their situations are improved by that fact.
14. The claim of John G. Hendricks, another cross-petitioner below and cross-petitioner in error in this court, stands upon'ground distinct from all others. He obtained a judgment against John B. Purcell, also after the assignment, upon a claim composed in part of an indebtedness for money deposited to bear interest, and in part for improvements and repairs placed upon the Cathedral, and for its preservation, at the request of the archbishop. We are all in accord upon the *148 proposition that the latter claim possesses peculiar merit, upon the principle that the trust property should answer for the reasonable expense incurred in its preservation and necessary repair and. improvement. We are not in accord, however, as to the means of effectuating this right. A majority of the i court is of opinion that the remedy may be granted in this (case, and for this purpose the judgment as to this claim is re-I versed and the cause remanded for further proceedings upon / this branch of the controversy. The eminent counsel who represents Hendricks, predicates his claim to be re-imbursed out of the general church property chiefly (to the extent of his entire claim) upon the authority which he maintains is conferred upon the archbishop by an ant of the general assembly passed January 3, 1825, which it is claimed was in force at the time of the assignment (2 Chase’s Stat. 1460).
It is entitled: “ An act securing to religious societies a perpetuity of title to lands and tenements conveyed in trust for meeting-houses, burying-grounds, or residence for preachers.”
It is as follows :
Sec. 1. Be it enacted, etc., that all lands and tenements, not exceeding twenty acres, that have been or hereafter may be conveyed by devise, purchase, or otherwise, to any person ■or persons as trustee, trustees, in trust for the use of any religious society within this state, either for a meeting-house, burying-ground, or residence of their preacher, shall descend with the improvements and appurtenances in perpetual succession in trust to such trustee or trustees as shall from time to time be elected or appointed by any such religious society, according to the rules and regulations of such society respectively.
Sec. 2. That the trustee or trustees, for the time being, of any religious society aforesaid, shall have the same power to defend and prosecute suits at law or in equity, and do all other acts for the protection, improvement and preservation of said property, as individuals may do in relation to their individual property.
Upon this proposition the counsel stands alone, and his contention has provoked a vigorous cross-fire from his co-defendants and the assignee. It is by them contended that the act, *149 if in force, does not and never was intended to apply to the Catholic Church and its bishops. We have not found it necessary to attempt a solution of this controversy. Conceding, for the purposes of the discussion, that it is broad enough to comprehend Catholic bishops and church property, it still falls far short of supporting the claim of Hendricks, that his claim for money deposited is a charge upon church property. It is maintained that the effect of this statute is to give to the official holding the trust property, power to sue and be sued in his own name — to defend and to prosecute suits at law or in equity— and to do all other acts, such as to make contracts, which individuals may do in relation to their individual property, for its protection, improvement and preservation. It is maintained that this act invested the archbishop with all the characteristics of a corporation sole, though it is said that this position is not essential to the argument.
The antecedent of “ said property ” in the second section of the act, is “ all lands not exceeding twenty acres conveyed, etc., to any person as trustee, either for a meeting-house, burying-ground, or residence of their preacher.” The power given is to do acts “ for the protection, improvement and preservation of said property. ”
As we have indicated, it required no legislation to authorize a charge upon this property for money expended “ for its protection, improvement and preservation.” The act in question contemplates the protection, etc., of specific property — “a meeting house, burying ground, or residence for the preacher.” There is no pretense that the money deposited by Hendricks was applied to the improvement, etc., of any particular church property. There is evidence that some of it was expended in the éducation of some young men for the priesthood. But the claim is supported upon the theory that the debt is diocesan, and that diocesan (meaning general church) property should satisfy it. This view of the case has already been sufficiently considered,' and an adverse conclusion reached.
15. No cross-petitions in error .are filed by the various congregations, etc., to the order of the court below, for an account of the assets of John B. Purcell, in the form of claims *150 for money advanced by him, for the construction of various churches, etc., nor is the claim made that such order is not a final one. We are all impressed with the general equity and fairness of this feature of the judgment below, and it is, for the reasons stated, left undisturbed.
16. Louis Nardini, trustee for Benedetto Gatto, one of the defendants below, filed his cross-petition setting up a mortgage upon the orphan asylum, executed by John B. Purcell, with which issue was joined, tidal had, and judgment rendered against him, to which he excepted. He filed his separate motion for a new trial, which was overruled ; he excepted and took his separate bill of exceptions. His claim was adverse to all the other parties in the case. He failed to file a cross-petition in error in this court within two years after the judgment against him. Has he a standing in this court? A cross-petition in error is not expressly authorized by our code. It was claimed in Seitz v. Railway Co., 16. Kan. 131, that the proceeding was unauthorized, and the court so held, and that a separate proceeding in error was necessary. The same question was first presented in this court in Shinkle v. The Bank, 22 Ohio St. 516. It was contended that such a pleading was unauthorized. The court, by Welch J., said : “There is no good reason why cross-petitions in error should not be allowed equally as in original actions. They were allowed at common law, and there is nothing in the code which forbids their use. On the contrary, they are calculated to subserve a leading object of the code, namely, to avoid multiplicity of suits, and to render litigation simple, cheap and speedy. * * * To summon the opposite party, who is already in court, and to bring in a copy of the record, a copy of which is already in court, would be a useless labor, and involve an unnecessary expense and delay, etc.” The Supreme Court of Kansas was again called upon to consider this question in Stettauer v. Carney, 20 Kan. 496, when it overruled its former decision upon the authority of Shinkle v. The Bank, supra, saying : “ We are constrained to believe that in this respect the decisions of the Supreme Court of Ohio are the better exposition of the law.”
*151 Again in Bundy v. Iron Co., 35 Ohio St. 80, a motion was made in this court for leave to file a cross-petition in error. At the time no leave was required to file petitions in error. It was said, by 'the court: “ As held in Shinkle v. First Nat. Bank, 22 Ohio St. 516, it is competent for a defendant in error to file a cross-petition asking the reversal of the judgment for errors prejudicial to him, and not assigned in the plaintiff’s petition. And as a petition in error may, under the present legislation, be filed without leave of court, the same rule will be applied to the cross-petition.”
The just inference is that if the law had required leave to file a petition in error, the same rule would necessarily have applied to a cross-petition in error. In the case before us the ■errors which Nardini relied upon were not assigned by the plaintiff in error; he stood upon his own right. The judgment against him stood unchallenged upon the record. There can be little doubt that if the proceeding in error by the plaintiff had been dismissed at any time before Nardini’s cross-petition in error was filed, his branch of the case would also have gone out of court. The logic of the foregoing cases and considerations is that such a proceeding is the prosecution of a proceeding in error ; but to avoid a multiplicity of suits, he may in the same case and upon the same record predicate that prosecution. If a law requiring leave to file a petition in error would apply as well to a cross-petition in error, they are so far upon the saíne footing as that if the two years’ limitation applies to one, it applies with the same force to the other. All parties in whose favor the judgment of which he complains was rendered (and it was in favor of all but himself), had a right to suppose, after the expiration of two years from its rendition, that it stood unquestioned, and was forever at rest. The cross-petition in error was filed too late. This conclusion relieves us of a further consideration of the question arising upon this mortgage, and the judgment thereon is affirmed.
17. The writer of this opinion does not concur in so much of the judgment as remands the case to the court below for further proceedings upon the claim of Hendricks; nor does he concur in the affirmance of so much of the judgment below as *152 devotes a part of the St. Joseph's Cemeteries to the payment of creditors, believing that these are quite clearly shown to be trust property, and that they did not pass to the assignee by the assignment.
With the modification above indicated of the judgment against Hendricks,

The judgment below is affirmed.

*153 CLOSES ARGUED AND DETERMINED IN THE SUPREME COURT OE OHIO. JANUARY TERM, 1889. Hon. Hon. Hon. Hon. Hon. SELW'YN N. OWEN, Chief Justice. FRANKLIN J. DICKMAN, THAD. A. MINSHALL, MARSHALL J. WILLIAMS, WILLIAM T. SPEAR. Judges.